IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76443-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| FISHER, CHARLES FRANK | ) | |
| DOB: 10/03/1957, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 25, 2019 |

SCHINDLER, J. — Charles Frank Fisher seeks reversal of the jury convictions of attempted rape in the second degree and attempted murder in the first degree. Fisher argues (1) prosecutorial misconduct during rebuttal closing argument violated his right to a fair trial, (2) extrinsic evidence may have resulted in prejudice, (3) police officer testimony violated his Miranda[1] right to remain silent, and (4) cumulative error deprived him of the right to a fair trial. Fisher also contends the court erred by imposing the $200 criminal filing fee.[2] We affirm the jury convictions but remand to strike the criminal filing fee.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] We grant Fisher's motion to file the supplemental assignment of error and supplemental brief challenging imposition of the criminal filing fee.

FACTS

At around 3:00 p.m. on Sunday, June 26, 2016, C.V. drove to Marina Beach Park in Edmonds to beachcomb and look for shells. Marina Beach Park is located south of the Edmonds Ferry Terminal. C.V. walked along the beach to the end of the dog park area. C.V. left a bag of art supplies and a book near a fence at the south edge of the dog park. C.V. walked "around the point" to a secluded and less populated area of the beach where the shoreline curves to the east. Train tracks run parallel to the beach located above an approximately 10-foot-tall rock and boulder embankment. There is an access road near the train tracks. On the other side of the access road is a very steep hill with dense vegetation.

C.V. knew the "tide was coming in" but "wanted to walk south while I had the chance to beachcomb." C.V. carried her cell phone and a "small sandwich-size Ziploc bag" for shells. As she walked along the beach, she saw fewer people.

At approximately 5:10 p.m., C.V. sent a text message to her spouse telling him that she found "a whole moon shell for the first time." C.V. decided to "turn around and head back." As she was walking back toward the dog park, C.V. saw a man, later identified as Charles Frank Fisher, walking toward her. C.V. noticed Fisher was "older" with "grayish/silverish hair," "wasn't wearing a shirt," and "was wearing gray sweats." C.V. said Fisher started walking toward her "at what appeared to be a pretty brisk pace for the beach."

When C.V. reached a "narrow path" along the beach where they were "going to have to pass" one another at "pretty close proximity," Fisher "kind of opened up his stance a bit" like "he was going to hug" her. But instead, Fisher knocked her cell phone

2

and the bag of shells out of her hand and "punched" her in the face, hitting her in the eye and hard enough to knock her down to the ground. When C.V. tried to get up, Fisher continued to knock her down to the ground by hitting or punching her. C.V. said Fisher was relentlessly "pummeling" her.

C.V. repeatedly asked Fisher, " 'Why are you hurting me? . . . What do you want?' " Fisher did not respond and "just kept punching" her. Her "eye was starting to close," her "vision was blurry and narrowing," and she was "really hurting" and "disoriented from a lot of the hits." When C.V. pleaded with him, " 'Please don't hurt me. You're hurting me,' " Fisher told her, " 'I want to fuck you.' " Fisher restrained C.V. from behind and lifted her skirt "to the point to where he realized that it wasn't actually a skirt" but shorts. C.V. told Fisher, " 'Okay. . . . But we can't do it here. We'll have to go somewhere . . . else.' " C.V. hoped that by "moving locations," she could get away or someone would see them and help her. But after she suggested they move to a different location, the "fury of the punches and the attack intensified."

C.V. "started screaming." Fisher tried to stop her from screaming "with choke holds or kind of pushing my face down, . . . and then even covering . . . my mouth with his hand." Fisher continued to hit C.V. in the "head area," but "[i]t was a different punch, and I just knew I couldn't take many — many more of those like that. It . . . just really rocked me." C.V. tried to keep her chin "on my neck" but Fisher got his hands around her neck and strangled her to the point where her airway was "restricted. I can't scream. I can't get enough air to scream. I'm trying to breathe." Fisher put C.V. in a "choke hold" and squeezed her neck hard enough to leave "finger marks."

3

Fisher told C.V., " 'I changed my mind. I don't want to fuck you. I'm going to kill you.' " Fisher said, " 'I know. I'll drown you. How about that? . . . You won't be able to scream then. Yeah, I'll drown you.' " Fisher said, " 'Good-bye,' " and "dragged" her toward the water. The waterline was only "a couple of inches" away. C.V. "really believed that he was going to kill me and intended to." As Fisher pulled C.V. into the water, she was able to grab onto "a very big rock." While hanging onto the rock facedown, Fisher was above and behind her "trying to pry my hands free." C.V. "decided no matter what, I'm not letting go of this rock" because she believed going into the water "was certain death." C.V. said Fisher "started hitting me with what I believed to be a rock or rocks on my back and the back of my head." C.V. believed Fisher was using a rock "because it felt different than his hand." C.V. "let go of the rock" she was holding onto, "flipped over," and began hitting Fisher. C.V. said that she "somehow slipped free of his grip" and "started running north down the beach . . . as fast as I could," screaming for help. C.V. saw a man and a woman "in the distance" walking "up on the tracks" and screamed, " 'Help. Help. Call 911.' "

Emily and Geoff Hovde heard "screaming" that "sounded like . . . somebody was seriously in trouble." They walked across the train tracks to the edge of the rock embankment "to see down" to the beach. C.V. was "a little bit south," "all the way down . . . where the water met the rocks." C.V. yelled, " '[A] man tried to . . . beat me. Tried to kill me. And tried to rape me. I've been beat up. He attacked me. Please help.' " C.V. "pointed back behind her . . . a few hundred feet, maybe," and the Hovdes "saw a guy climbing up the rocks towards the [access] road."

The Hovdes told C.V. to climb up the rock embankment and "[w]e'll call 911." Geoff[3] said C.V. "was so out of breath she could almost hardly talk" and "seemed all shook up. She was bleeding." Emily said C.V. was exhausted, "scraped up" and "bloody," and her clothing and hair were disheveled.

> She was exhausted. I remember that. And I think she was trying to keep calm and trying to kind of process what was going on. She — did notice that one side of her face was . . . scraped up, it was bloody. The white part of one of her eyes was — you know, had a broken blood vessel or two. It definitely had something happen there.
> But I noticed that the back of — her swimsuit was kind of like a tankini[4] to there was a clip in the back that had been undone. . . .
> . . . .
> . . . I noticed that her — I think it was both of her knees that were scraped up. They both looked bloody; I wouldn't be able to say for sure. Really, what mostly was her face, maybe a little bit of blood in her hair. Her hair was — it was pretty — pretty messed up, pretty disheveled.

Geoff called 911 at 5:28 p.m. C.V. told the 911 operator she had been attacked and described Fisher. While on the phone with 911, C.V. and the Hovdes saw Fisher at the top of the rock embankment, "grabbing a bag." C.V. said, "[I]t seemed like he possibly reached down and grabbed a bag and then took, like, that last step up" onto the train tracks. Fisher started "speed-walking" on the access road in the opposite direction toward the dog park. Emily said it looked like Fisher "was trying to get away" and "trying to keep [us] from getting a good look at his face." Geoff said Fisher was "sweating" and "very fatigued looking. You know, he wasn't even running really fast. It was kind of like a little jog, almost, kind of with his head down."

---

[3] We refer to Emily and Geoff Hovde by their first names for clarity.
[4] A two-piece swimsuit consisting of bikini briefs and a tank top.

5

The Hovdes and C.V. began to "walk slowly . . . back towards the dog park[ ]." They tried to keep Fisher in their sight but when Fisher "went around" the bend in the road, they "couldn't see him anymore."

Edmonds Police Officer Ross Sutton arrived within two to five minutes of the 911 call. C.V. "looked very upset, like she'd been crying." C.V. had cuts, scrapes, blood, and wet sand on her body. C.V. told Officer Sutton that a man attacked her, "told her he wanted to fuck her," and then tried to drown her. C.V. described Fisher and said he had "very blue or intense . . . eyes." Emily and Geoff said Fisher had gray hair, was wearing gray sweatpants, and was not wearing a shirt. They said Fisher was carrying "some sort of a bag" or a "[s]weater or something." Officer Sutton called medics and took photographs of C.V.

Officer Brian McIntyre and other officers arrived and went to the dog park to question witnesses. A man told Officer McIntyre that his son saw a man "without a shirt run off into that wooded cliff area" on the other side of the train tracks. Julianne Vannoy told police that while she was walking south along "a little path" near the fence that "separates the [dog] park from the railroad tracks," she saw Fisher "frantically trying" to climb the steep hill above the train tracks through dense vegetation. Vannoy described Fisher as "an older white male wearing gray sweats." Vannoy said he "didn't have a shirt on" and was holding "a white T-shirt in his hand" that "kept getting caught on brambles."

The police officers contacted Lynnwood Police K-9 Officer Jacob Hubby. When Officer Hubby and his dog arrived, Edmonds Police Officer Michael Bower used a patrol car public-address system to announce the K-9 is "going to be deployed. Please come

6

down." After repeating the announcement and getting no response, Officer Hubby, the dog, Officer Bower, and Edmonds Police Officer Robert Peck climbed up the steep hill. Officer Bower described climbing up the hillside:

> That hillside has a pretty good grade on it. I mean, when we went up the hill, it was not an easy climb. There was no pathway that was preexisting. You could see that the vegetation was, like, mashed down by somebody that had obviously just blazed their own path up into the woods, and we're following that path, it looked like. . . . I mean, one of these things that we're slipping and sliding on our boots.

Officer Peck described the hillside as "extremely steep[ ]— if you were to stand up straight and put your arms out, you could touch the hillside. I mean, it was that steep. It was full of brush, trees, sticker bushes, you name it was in there. It was super, super thick."

When the officers reached the wooded area about halfway up the hillside, Officer Bower heard a male voice say, " 'Here. I'm here. Come get your dog.['] " The dog had bitten his hand, arm, and leg.

> [H]e sounded pretty calm. I couldn't see the dog from my position. And I think the K-9 handler was trying to catch up to his dog because the brush was so thick.
> And you could hear the dog. And we got up to where he was, I finally saw him, and I saw an older male with gray hair, a grayish zip-up sweatshirt, gray sweatpants, and I think brown boots, in a sitting position in the woods, kind of facing us.

Fisher looked at Officer Bower and said, "I know you." Officer Bower did not reply. The man then "suddenly blurted out in front of all of us, he said, That bitch. We were smoking weed, and she yelled rape, and I got the fuck out of there." Fisher told Officer Bower, "I knew the dog and you guys were going to find me, or something along those lines."

7

Officer Hubby and Officer Peck placed Fisher in handcuffs and helped him get "back down" the hill. When they reached the access road, the officers took photographs of Fisher. The Hovdes identified Fisher as the man they saw earlier. C.V. "was frightened" and "really scared" and would not get out of the aid car. Officer Sutton asked C.V. if she recognized the person in custody. C.V. "looked through the windows" of the aid car and said Fisher "matched" the "physical characteristics of the person that attacked her." C.V. said the man who attacked her " 'didn't have that many clothes on.' " But when Fisher took off "his top, a shirt or sweatshirt, took that off, . . . that had a visible effect on her. . . . She — there wasn't a lot of question when he didn't have his shirt on that that was the individual." Medics drove C.V. and Fisher to Swedish Medical Center in Edmonds.

The next day, police officers and C.V. and her spouse went to the beach to search for her cell phone. They arrived at around 3:30 p.m. when "the tide would be somewhere around the level that the tide was at the time of the incident." C.V. identified the area where the attack occurred. Her spouse found the cell phone in the water nearby. The police took photographs.

The State charged Fisher with attempted rape in the second degree and attempted murder in the first degree. Fisher pleaded not guilty.

The State called a number of witnesses to testify during the five-day jury trial, including C.V., her spouse, Emily and Geoff Hovde, Officer Sutton, Officer Bower, Officer Peck, K-9 Officer Hubby, Edmonds Police Detective Mark Froland, Swedish emergency room physician Dr. Gregg Miller, and Washington State Patrol Crime Laboratory (WSPCL) forensic scientists. Fisher did not testify.

8

The court admitted into evidence more than 120 exhibits. The parties stipulated to the admission of "Exhibits 1 to 118." Exhibits 1 to 118 include a number of photographs of the beach, rock embankment, railroad tracks, access road, and steep hillside area; photographs of where the attack occurred on the beach and locating the cell phone; photographs of the injuries to C.V. and Fisher; photographs of the clothes C.V. and Fisher were wearing, Fisher in police custody, and green matter seized from Fisher when he was arrested; and copies of text messages between C.V. and her spouse on June 26, 2016. The court also admitted into evidence a number of other exhibits, including the 911 call recording; drone video footage of Marina Beach Park and the beach, rock embankment, railroad tracks, access road, and steep hillside area; and C.V.'s journal entries describing the attack. The State played the 911 call and showed the jury the drone video during trial.

C.V. testified extensively about the attack. C.V. said that while Fisher continued to punch her, she kept asking him, " 'Why are you hurting me? You're hurting me. Why are you doing it,' " while at the same time she was "trying to defend" herself.

> I was doing a combination of trying to defend myself and hit him and hit back. I was — I was trying to protect my head. The punch, the initial punch in my eye socket, really — it hurt. It rocked me. I wanted to try to protect my head.
> I ended up blocking a lot of the punches with my left upper arm, because that arm was just a solid contusion from my shoulder to my elbow from just the multiple blows that I blocked that way.

C.V. testified, "I've been asked many times, 'How many times did he hit you?' And it's been really hard to place a number on that, because I wasn't counting, and it's something that's hard to keep track of when you're being hit." C.V. testified there were at least four "rests." "[I]n my notes I wrote — I said, 'Four maybe five.' So I know it was

at least four. I had distinct memories of four, stopping while fighting for air, and taking a rest. So, like, that's a much better way for me to quantify how long it lasted."

C.V. testified that after she suggested moving locations, Fisher punched her hard again in her eye or temple, knocking her to the ground, and "that really disoriented me."

> I took a really big — just another really big hit to the head that really disoriented me, and I — scared me, and I thought that if I got hit like that too many more times, I started to worry about losing consciousness.

C.V. testified that when Fisher said he was going to kill her and said "good-bye," he "twisted his head around and was looking right in my eyes. And I, again, definitely noticed his bright blue eyes at that time." C.V. believed he was going to kill her, and they were "grappling" and "fighting" as "he's pulling me towards the water" before she was able to grab onto a rock.

> I just grabbed — in my thinking of no matter what, I can't get to the water and that will be the end, I grabbed onto the rock — a big rock, and it had a great little lip on it kind of down low, and it thankfully was a very big rock, and it was not — it was not too big to hold onto and big enough that it had a nice gripper, and a nice lip underneath and close, and it was stuck in the sand. It didn't move. So it was — that's the lucky part.

C.V. said Fisher was behind her "still hitting me."

> I kind of leapt for this rock. . . . My head is facing east. . . . Towards the railroad tracks.
> Q. Okay.
> A. So I'm on my belly . . . —
> Q. And where was he in relation to you?
> A. He was behind me.
> Q. Doing what?
> A. Well, he was still hitting me and it — and at first I remember him trying to pry my hands free, and then I was screaming as I could. He's trying to . . . pry my hands free. I wasn't letting him.
> Then he started hitting me with what I believed to be a rock or rocks on my back and the back of my head. . . .
> Q. So your face —
> A. Some of them missed but — I only had, like, four — four good, big lumps on the back of my head. So some of them must have, like,

10

missed or skiffed (sic) me, and I felt like it was a rock because it felt different than his hand.

C.V. testified about her injuries and the "[a]brasions and scratches" "all over" her body. The State introduced photographs C.V. took during the week after the attack. The photographs show a "deep gash" on her knee, the "blackness and swelling around both" of her "black eyes," the "blood in . . . both of my eyes," scratches and bruising under her upper arms "from being grabbed and held," "scrapes" on her elbow, and the marks on her neck and "a little half crescent fingernail mark" "from the choking and being restrained."

On cross-examination, C.V. testified she had four bumps on the back of her head from Fisher hitting her while she was hanging onto the rock in the water. C.V. said she could not see what Fisher was using to hit her, but "[i]t felt different than fists, and it felt like a harder, blunt object." C.V. said she could "actually feel" the bumps on her head. C.V. was not sure that she told the emergency room doctor about the bumps on her head. "I may or may not have. I may have been more focused on my other injuries. . . . I was very traumatized, having had somebody just try to kill me and rape me." C.V. did not think she pointed out the bumps on her head to the sexual assault nurse because the nurse "was there to collect DNA."[5] C.V. testified she did not remember either the nurse or the doctor examining her head.

C.V. testified that on the day of the attack, after she had the "opportunity to look at [Fisher] and see him with his shirt undone," she was "certain" that he was the man who attacked her.

---

[5] Deoxyribonucleic acid.

11

C.V. testified she could recall the details of the attack because she "immediately . . . wrote down what happened to me" in her journal.

> [T]he private things I wrote, I — immediately after it happened, wrote down what happened to me, simply because of that worry, because I knew that — I mean, the — it was such a vicious attack and that I was going to have — I was worried about having problems remembering and such.
> So my answer to that is I did focus on the attack and what happened to me physically, and I wrote that down in great detail. I, however, didn't detail my ER[6] visit, one, because personally, that was — I don't want to say "less important," but I also knew that there were physical, written records of my ER visit.
> So if I needed to know anything about my ER visit, that's all going to be in the medical records and all documented, but my attack was not documented.

On redirect, the court admitted C.V.'s journal entries into evidence. C.V. testified she was "reluctant" to turn over her journal entries. "[M]y biggest concern was I had written it without thinking that anybody else would read it so it was just a lot more about my inner thoughts and, like, private thoughts. I — you know, I used cuss words in it, I was just, like, sharing my raw emotions." But C.V. said that when she read the journal entries for the first time a few days before trial, she was "really surprised how accurate it was and how much detail it did include."

Emily Hovde testified C.V. said she "needed help" and "someone had tried to rape her and was beating her up." Emily said C.V. was "clearly shooken up." "She had blood on her face and sand on her face, I remember she was trying to wipe kind of away from her eyes, and breathing pretty heavily."

Geoff Hovde testified that C.V. "was extremely fatigued" and was "so out of breath she could almost hardly talk." Geoff said C.V. was bleeding, had "scratches" on her knees and arms and "blood in her hair," and "the back top button" of C.V.'s top "was

---

[6] Emergency room.

12

undone." Geoff testified C.V. said, "He attacked me." As C.V. pointed "up the beach," Geoff "saw a man climbing up over the rocks."

Officer Sutton testified that because Fisher had a "jacket on," C.V. was uncertain that he was the man who attacked her. "[S]he was very certain that the person who attacked her was just wearing gray sweatpants and didn't have any . . . shirt on."

> We were . . . about 40 feet away, so it was very hard to see any detail in the description. She commented that he matched the size, I guess, the physical characteristics of the person that attacked her. But she was unable to say for certain whether it was him or not.

Officer Sutton testified that as he was getting out of the aid car, C.V. "commented to me specifically what she did remember about the guy was how very blue or intense his eyes were." Officer Sutton walked over to Fisher. Officer Sutton testified, "[I]t was my observation that his eyes were very intensely blue like [C.V.] had described."

Swedish emergency room physician Dr. Gregg Miller examined C.V. on June 26, 2016. C.V. told Dr. Miller a man attacked, beat, and strangled her at the beach. C.V. told Dr. Miller that as she was walking on the beach, "she saw a man coming towards her, who seemed to be approaching her in an unusual way. . . . He came to, like, hug her, and she tried — I think she said she tried to dodge him . . . , and then he assaulted her." C.V. told Dr. Miller she "fought back, and he continued to assault her, and she continued to fight back." Dr. Miller testified the attack "sounded like it was a really prolonged — I mean, it wasn't just a punch and then move on. It sounded like it was a real struggle." Dr. Miller noted C.V. was "really shaken up, obviously, after such a terrible incident."

13

Dr. Miller used photographs taken at the hospital to describe the "multiple different areas [that] have been injured." C.V. had "a lot of abrasions, and she mentioned a lot of areas of pain, in particular her knee where she had a laceration." Dr. Miller testified the "deep[ ] cut" on her right knee required stitches and she had a broken finger.

Dr. Miller testified C.V. told him "she had been struck in the head — or somehow had her head struck, maybe it was struck on the ground or maybe he struck her." Dr. Miller testified C.V. suffered "blunt head trauma" and had been strangled.

> Her head didn't seem to — her head itself didn't seem to have sustained any major trauma. Her eyes, she had kind of a bloodshot right eye from some trauma or perhaps from the strangulation injury. Perhaps when you're strangled, blood vessels can pop, and you see it in the eyes and the skin of the head — or the skin of the face where the capillaries rupture from being strangled.

Dr. Miller testified C.V. had "what looked to me to be likely choke marks, she had bruising around her neck." The linear bruising on her neck was "very consistent with finger marks" and strangulation and showed "somebody had to grab her by the neck to cause that type of injury."

Dr. Miller testified C.V. had "bruising" and "scrapes" on her face, "a lot of abrasions and scrapes . . . scattered up and down her back," and "a lot of abrasions . . . on her extremities." C.V. had scrapes and bruises on her arms and elbows, her inner and outer thighs, and above and below her left knee. Dr. Miller testified the injuries to C.V.'s face show "this wasn't just a single injury. It wasn't like she was struck one time. It wasn't like she had a single hit. This was a prolonged, vicious . . . physical altercation here." Dr. Miller said the injuries to her left arm were consistent with "a defensive injury, somebody shielding themselves." Dr. Miller testified the injuries were "absolutely"

14

consistent with C.V.'s account of the attack, "as well as the account of the incident that the paramedics had given."

Forensic nurse Jennifer Newmarch testified she conducted an examination of C.V., took photographs of her "multiple injuries," and obtained swab samples from C.V.'s mouth, neck, chest, and fingernails for DNA testing. Newmarch also collected C.V.'s clothing.

Forensic nurse Kristine Perry testified about her examination of Fisher at the hospital. Perry took photographs of Fisher's injuries from the dog bite wounds to his hand, arm, and leg and swabs from his mouth, hands, wrists, and fingernails for DNA testing. The photographs show Fisher had abrasions and bruising "pretty much over his whole body" and scratches on his face, including "a puncture mark on his upper left cheek" and "bruising to his right cheek bone with scattered abrasions to his face." Fisher had an injury to "the top of his nose" and "dried blood surrounding and inside his ear." Perry testified the "multiple areas of abrasion" to Fisher's upper body were "superficial" and "consistent with" a person who has "crawled through blackberry bushes."

WSPCL forensic scientists testified that the DNA samples from C.V.'s neck and chest matched Fisher's DNA. Forensic scientist Carol Vo testified, "[I]t is 960 quadrillion times more likely" that the DNA profile is from Fisher than from some random unknown person. DNA testing also showed Fisher was a contributor to the DNA from the swabs from C.V.'s fingernails. Forensic scientist Kristina Hoffman testified Fisher's DNA profile obtained from C.V.'s "left hand fingernail sample . . . would not be expected to occur more frequently than 1 in 8600 male individuals in the U.S. population."

The court instructed the jury on the charged crimes of attempted rape in the second degree and attempted murder in the first degree. The court also instructed the jury on the lesser included offense of attempted murder in the second degree.

In closing argument, the prosecutor argued there is "no debate whatsoever that it was the defendant at the focus of this investigation." The prosecutor asserted whether to convict Fisher of attempted rape and attempted murder turned on whether the jury believed C.V. "Do you believe what she said? Do you find her credible?"

The prosecutor reviewed the undisputed evidence that supported C.V.'s testimony. "Let's just look at what else we know about what happened in this case that is beyond any dispute." The prosecutor argued there is no dispute the attack happened on June 26, 2016 on the stretch of beach south of the Marina Beach Park dog park between the last text message C.V. sent her spouse at approximately 5:10 p.m. and the 911 call at 5:28 p.m.

> We know beyond any dispute whatsoever that there was some kind of contact between the defendant and [C.V.]. And we know that because of the defendant's own brief statements to the police when they first contacted him.
> And he said, We were down there, and she started crying rape and I ran away. No question from that very general statement that he's talking about an encounter with [C.V.], under the circumstances.

The prosecutor argued the uncontroverted DNA evidence established physical contact between Fisher and C.V., "person to person, body to body." The prosecutor argued there is no dispute Fisher climbed "up a steep hillside at some great effort, through thicker bushes and thorns and up rocks and dirt, hiding from the police."

The prosecutor pointed to other evidence that corroborated C.V.'s account of the attack, including the photographs showing her injuries.

> We have [C.V.] on the 26th, crying, bloody, sandy, disheveled. We have pictures of her from the hospital that day with myriad scratches and bruises and cuts and scrapes, with a bloody eye, with scrapes on her throat.
> We have pictures of a healing [C.V.], days after, still black under both eyes, bruises all over her body. . . .
> Bruises on her face from being struck; scratches on her face; a bloody eye; scratches on her neck that are wider and still linear, consistent with being strangled, or "throttled" is what the doctor told us.

The prosecutor argued the testimony of Dr. Miller, the testimony of the Hovdes, the 911 call, locating her cell phone the next day near where the attack occurred, and C.V.'s journal entries corroborated her testimony about the attack.

The prosecutor noted the Hovdes saw C.V. "running toward them, clearly shaken, screaming, crying, asking them to call 911." When the Hovdes saw C.V., "there was only one other person in sight, and that was the defendant, coming from the area where [C.V.] had just been."

The prosecutor argued the journal entries provided more corroboration.

> More corroboration of what [C.V.] testified to is her journal. I understand you haven't had a chance to read it yet, it's admitted into evidence. It's available to you. It's about 32 pages long. But I would encourage you to take the time to review it carefully. Maybe have somebody read it or take turns reading it out loud or read it all for yourselves it's up to you.
> But remember what she told you about that journal, that she wrote it shortly after the incident, the following day or a couple days later. Never intending for anybody else to ever see it. Certainly not intending it to be an official statement or account of what happened to her.
> And I predict that when you do read it, you will see how raw and how powerful her account is. It's full of emotion, it's full of self-reflection, it's full of frustration and swearing and grit and dirt and will and detail and power.

17

The prosecutor argued C.V.'s testimony was "[n]ot just consistent in the accounts that she provided along the way from the initial encounter with the Hovdes to the police to the account she provided Dr. Miller at the hospital," but "all the way through — up through her testimony" at trial.

In closing argument, defense counsel conceded the State "has absolutely proved . . . these two people had contact" and C.V. was injured.

> Two people were at the beach, [C.V.], Charles Fisher. We both know they were there; we know they had contact.
> And let me back up: We know they were both there because [C.V.] talked to the Hovdes, she then contacted the police. She was contacted at the beach. Charles Fisher was also contacted at the beach. They were both there.
> We know that these two people had contact. We absolutely know this. There was DNA, you heard from the forensic scientists. They absolutely had contact.
> We also know that [C.V.] was injured. How do we know this? Her husband didn't tell you she was injured that morning. She had no injuries. She went to the beach, and she left the beach injured. So we absolutely know that she was injured at the beach.

Defense counsel argued no one knew what happened and certain details were not true.

> I want to spend some time talking about details. I want to talk to you about the things that we actually know happened, what is true, what no one can say did not happen.
> And I want to spend some time talking to you about things that we know are not true, details. And then I want to spend some time talking about things that are just simply unexplainable.

After pointing out inconsistencies in C.V.'s testimony about what happened, defense counsel argued C.V. was not credible and her testimony did not support finding Fisher guilty of attempted rape in the second degree or premeditated attempted murder in the first degree.

The jury found Fisher guilty of attempted rape in the second degree and attempted murder in the first degree.

18

Before the sentencing hearing, the defense submitted a number of letters from family and friends in support of an exceptional sentence downward. At sentencing, the court rejected the request and imposed a standard range sentence.

> You received a fair trial. Twelve jurors who considered all of the evidence concluded beyond a reasonable doubt that you're guilty of the attempted rape in the second degree and attempted murder in the first degree.
>
> It's inexplicable if you weren't responsible why you would run away when the police were summoned and find you off on a hillside trying to avoid apprehension.
>
> I don't question that, apart from some problems with alcohol, you've been a hard working man, a good father, and a good friend to many. And alcohol or drugs don't seem to have been involved here in any way. So what caused you to act out of character may never be known or understood. . . .
>
> . . . .
>
> I don't have any explanation for what happened. I don't know if this was planned or simply a crime of opportunity. The victim was simply out for a beach walk on a nice day. She didn't know you, and you didn't know her. The attack was unprovoked from every bit of evidence that was produced here in court. It is probably every woman's nightmare to be sexually assaulted by a complete stranger. It's the sort of thing that people think can't happen, particularly in a community like Edmonds, but it can, and, unfortunately, it did.

## ANALYSIS

Fisher seeks reversal of the jury convictions of attempted rape in the second degree and attempted murder in the first degree murder. Fisher claims (1) prosecutorial misconduct violated his right to a fair trial, (2) extrinsic evidence may have resulted in prejudice, (3) police officer testimony violated Miranda[7] and his right to remain silent, and (4) cumulative error deprived him of the right to a fair trial. Fisher also challenges imposition of the criminal filing fee.

---

[7] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

(1) Prosecutorial Misconduct

Fisher contends prosecutorial misconduct during closing rebuttal argument violated his constitutional right to a fair trial. "The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 703, 286 P.3d 673 (2012).

We review allegations of prosecutorial misconduct during closing argument for abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). To prevail on a claim of prosecutorial misconduct, the defendant must "show that in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." Glasmann, 175 Wn.2d at 704; State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).

The prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and express such inferences to the jury. State v. Magers, 164 Wn.2d 174, 192, 189 P.3d 126 (2008); State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997). A defendant establishes prejudice if there is a substantial likelihood the misconduct affected the jury's verdict. State v. Emery, 161 Wn. App. 172, 192, 253 P.3d 413 (2011).

Fisher contends the prosecutor improperly expressed a personal opinion and appealed to the passion and prejudice of the jury in rebuttal argument. An appeal to the passion and prejudice of the jury is improper. State v. Gregory, 158 Wn.2d 759, 808, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014). A prosecutor cannot express a personal opinion as to the

credibility of a witness or appeal to the passion and prejudice of the jury. Lindsay, 180

Wn.2d at 437; In re Pers. Restraint of Cross, 180 Wn.2d 664, 724-25, 327 P.3d 660

(2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621

(2018). However, there is no prejudicial error "unless it is clear and unmistakable that

counsel is expressing a personal opinion." State v. Warren, 165 Wn.2d 17, 30, 195

P.3d 940 (2008).

During cross-examination, defense counsel questioned C.V. about the number of

times she was hit during the attack. "I think you indicated you were hit well over 100

times?" C.V. testified she could not "quantify" the number of times she was hit.

> So let's talk about the attack. You're hit repeatedly.
> A.    Correct.
> Q.    I think your word is "pummeled."
> A.    That's one of them, uh-huh.
> Q.    I can think of some others you used, but why don't you tell us some others. How would you describe that attack? It sounds absolutely vicious.
> A.    It was absolutely vicious, yeah.
> Q.    I think you indicated you were hit well over 100 times?
> A.    Yeah, I — I think that I indicated that somewhere, but I'm not sure where. I was — I think it was the detectives were really pressing me for how many times, and that is a really hard thing to quantify, as I mentioned in my testimony.
> Q.    But you can actually quantify it, because there were at least four separate portions of the attack.
> A.    The rests that he took helped with quantifying the length, yeah. Yes.

In closing argument, defense counsel told the jury C.V.'s testimony about what

happened was not credible because "[s]he was not hit over a hundred times in the

head" and her injuries were not consistent with that account.

> She just simply was not hit over a hundred times. She was simply not hit with a rock or a blunt object. Unexplainable. You're beating someone, you take a rest. You beat them with renewed fury, you take a rest.

21

Somehow he has her on the ground, somehow he's choking her. You beat her again, you take another rest. According to her, there were at least four rests. This was a lengthy, sustained, vicious attack.

What she's telling you is just simply — I can't put it as not true, but it's unexplainable.

In rebuttal, the prosecutor responded to the defense closing argument. The defense attorney did not object to the following argument of the prosecutor:

Let me offer a couple quick responses to things that [defense counsel] talked to you about. Questions about the accuracy of [C.V.]'s recollection or account about how many times she was hit.

Who asked that question in the first place? It wasn't me. It's a classically designed no-win question. When you ask somebody under [C.V.]'s circumstances, How many times do you think you were hit? just think about that question for a second.

Think about yourself under the circumstances, and if someone asks you that question, you can't win with whatever answer you give. And, frankly, from your perspective, she can't win either.

If she would have said — just think about how this would play out. If he asked her on the witness stand, How many times do you think you were hit in total from beginning to end? what if she had taken a moment, looked up, and pondered it and said, 73?

What would you be thinking as jurors if you heard that? You would think, Really? BS.[8] And she told you why. She was asked the question on the stand and she said, you know, Not the kind of thing you're really keeping track of.

Just imagine that, on the ground being pummeled one, one, two, that's three, four five six, seven. Ridiculous. You can see I don't need to spin this out any further how ridiculous that line of questioning is.

Where, as here, defense counsel does not object at trial, any error is waived unless the conduct is "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653

---

[8] Bullshit.

(2012).[9] Under this "heightened standard," the defendant must show "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " Emery, 174 Wn.2d at 761 (quoting Thorgerson, 172 Wn.2d at 455). When evaluating whether misconduct is flagrant and ill intentioned, we "focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762.

For the first time on appeal, Fisher contends the prosecutor committed misconduct by expressing his personal opinion that the defense argument was "ridiculous" and appealed to the passion and prejudice of the jury by asking the jurors to "[t]hink about yourself under the circumstances."

State v. Pierce, 169 Wn. App. 533, 280 P.3d 1158 (2012), is distinguishable. In Pierce, the court held it was improper for the prosecutor to invite the jurors "to imagine themselves in the position of being murdered in their own homes." Pierce, 169 Wn. App. at 556. Here, the prosecutor did not ask the jury to place themselves in C.V.'s position. The prosecutor asked the jury to consider the possible answers C.V. could

---

[9] The Washington Supreme Court in In re Personal Restraint of Phelps, 190 Wn.2d 155, 170-71, 410 P.3d 1142 (2018), notes:

We have found prosecutorial misconduct to be flagrant and ill intentioned in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence, such as those comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner. See State v. Monday, 171 Wn.2d 667, 257 P.3d 551 (2011); State v. Belgarde, 110 Wn.2d 504, 508, 755 P.2d 174 (1988) (holding a prosecutor committed flagrant and ill-intentioned misconduct by telling the jury the defendant in a murder trial was " 'strong' " with the American Indian Movement (AIM) and calling AIM a " 'deadly group of madmen' " and " 'butchers that kill indiscriminately' "); Glasmann, 175 Wn.2d at 701-02 (holding it was flagrant and ill-intentioned misconduct for a prosecutor to present slides of the defendant's booking photograph with words like " 'GUILTY' " and " 'WHY SHOULD YOU BELIEVE ANYTHING HE SAYS ABOUT THE ASSAULT?' " superimposed over the photograph in bold red letters).

give about the number of times Fisher struck her. The prosecutor argued that asking C.V. to quantify the number of blows placed her in a "no-win" situation because it is "[n]ot the kind of thing you're really keeping track of."

Fisher cannot overcome the burden of showing any misconduct was so flagrant and ill intentioned that a timely objection and curative instruction could not have obviated any prejudice. Further, even if improper, in the context of the entire record and the defense cross-examination at trial, the prosecutor's statements in rebuttal were a fair response to the defense argument.

Improper remarks by the prosecutor are not grounds for reversal " 'if they were invited or provoked by defense counsel and are in reply to his or her acts and statements, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective.' " State v. Weber, 159 Wn.2d 252, 276-77, 149 P.3d 646 (2006) (quoting State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)). "[I]t is not misconduct for a prosecutor to argue the evidence does not support the defense theory; prosecutors are entitled to respond to defense counsel's arguments." In re Pers. Restraint of Phelps, 190 Wn.2d 155, 167, 410 P.3d 1142 (2018) (citing Russell, 125 Wn.2d at 87).

Unlike in Lindsay, the argument that it was "ridiculous" to expect C.V. to count each blow during the attack was in response to the defense argument. See Lindsay, 180 Wn.2d at 438[10] ("An isolated use of the term 'ridiculous' to describe a witness's testimony is not improper in every circumstance. But labeling testimony 'the most ridiculous thing I've ever heard' is an obvious expression of personal opinion as to [witness] credibility.").

---

[10] Emphasis in original.

24

Fisher contends the prosecutor denigrated the role of defense counsel by characterizing the defense argument as "a trap" and suggesting defense "counsel had 'ill intent.' " When the prosecutor argued that "to attack her answer was similarly ridiculous. It's a trap said set up by the defense. I don't mean to suggest any ill intent," the defense attorney objected, "I think this is misconduct." The court overruled the objection but instructed the jury to "disregard anything which it feels is opinion evidence by the prosecutor."

A prosecutor may not impugn the role or integrity of defense counsel. Lindsay, 180 Wn.2d at 431-32. Characterizing the defense cross-examination as "a trap . . . set up by the defense" is improper. See Lindsay, 180 Wn.2d at 433-34. The prosecutor improperly characterized the cross-examination question as "a trap" but expressly stated, "I don't mean to suggest any ill intent." The court also instructed the jury to disregard the prosecutor's remarks and we presume the jury follows the court's instructions. State v. Dent, 123 Wn.2d 467, 486, 869 P.2d 392 (1994).

(2) Extrinsic Evidence

For the first time on appeal, Fisher contends he may have been prejudiced by the jury's consideration of extrinsic evidence that was not admitted at trial. It is "misconduct for a jury to consider extrinsic evidence and if it does, that may be a basis for a new trial." State v. Pete, 152 Wn.2d 546, 552, 98 P.3d 803 (2004). " '[E]xtrinsic evidence is defined as information that is outside all the evidence admitted at trial, either orally or by document.' " Pete, 152 Wn.2d 552[11] (quoting State v. Balisok, 123 Wn.2d 114, 118, 866 P.2d 631 (1994)). "This type of 'evidence is improper because it is not subject to

---

[11] Emphasis in original; internal quotation marks omitted.

objection, cross examination, explanation or rebuttal.' " Pete, 152 Wn.2d 553 (quoting Balisok, 123 Wn.2d at 118). Where "the jury received evidence that it should not have seen, the critical question that remains is whether the jury's receipt of this evidence prejudiced" the defendant. Pete, 152 Wn.2d 554.

In Pete, the trial court inadvertently allowed the jury to review two unadmitted documents, the written and signed statement that Pete gave the police after his arrest and a police report that included other contradictory statements. Pete, 152 Wn.2d 553. The court concluded, "The submission of the two documents to the jury seriously undermined this defense and nothing short of a new trial can correct the error." Pete, 152 Wn.2d 554-55. The court expressly rejected the assertion that its decision established a per se rule that required a new trial every time a jury is improperly presented with evidence:

> We have not endorsed a per se rule by our decision here. We continue to apply the long-standing rule that "consideration of any material by a jury not properly admitted as evidence vitiates a verdict when there is a reasonable ground to believe that the defendant may have been prejudiced."

Pete, 152 Wn.2d at 555 n.4[12] (quoting State v. Rinkes, 70 Wn.2d 854, 862, 425 P.2d 658 (1967)); see also Glasmann, 175 Wn.2d at 705.

Here, the court admitted into evidence approximately 130 exhibits. At the beginning of trial, the parties stipulated to the admission of Exhibits 1 to 118. Exhibits 1 to 118 include photographs of Fisher; aerial map photographs of Marina Beach Park and the beach, rock embankment, access road, and steep hillside; photographs of C.V. and her injuries; photographs of Fisher in police custody and his injuries; photographs of

---

[12] Emphasis in original.

the clothing of C.V. and Fisher; and photographs of other evidence, such as a photograph of green matter, a glass pipe, C.V.'s cell phone after it was recovered, and text messages.

During the testimony of Geoff Hovde and without objection, the court admitted a CD[13] that contained the 911 call, "Exhibit 127." The State played the 911 call for the jury. The court also admitted a CD of a drone video of the beach and hillside, "Exhibit 133." The State played the drone footage video for the jury.

Jury instruction 1 states, "The exhibits that have been admitted will be available to you in the jury room." In closing argument, the prosecutor told the jury, "[A]ll of the evidence, all of the exhibits that were admitted into evidence, you'll get back in the jury room."

> You'll actually have physical access to all the pictures; we'll provide you with the ability to watch the drone video if you choose; we'll have [C.V.]'s journal; we have the 911 call. All the things that you've heard published in court will be accessible to you.

The record does not reflect any discussion before jury deliberations about providing equipment to the jury to listen to the 911 call or view the drone video. See State v. Castellanos, 132 Wn.2d 94, 97-100, 935 P.2d 1353 (1997) (trial court has discretion to allow jury to have unlimited access to tape recordings or require the jury to request to replay any recordings to prevent undue influence).

For the first time on appeal, Fisher points out that Exhibit 127, the 911 call CD, contains folders and subfolders with photographs that were not admitted at trial.[14] Fisher argues the photographs of him in handcuffs, photographs of his injuries and his

---

[13] Compact disc.

[14] The record indicates neither the prosecutor nor the defense attorney were aware of the additional photographs on the 911 CD.

27

face, the photograph of a leafy green substance with a scale, and the two photographs of his driver's license are prejudicial and require reversal. We disagree.

Exhibit 127 includes a folder labeled "Photos sent to pros on 070516." The "Photos sent to pros on 070516" folder contains four subfolders: the "Richardson" subfolder, the "scene" subfolder, the "scene_Bower" subfolder, and the "Temporary Burn Folder" subfolder.[15] There are approximately 265 photographs in the four subfolders.

Because the jury did not request equipment to listen to the 911 CD, the record does not support the argument that the jury saw any of the photographs in the four subfolders. In any event, almost all of the photographs are duplicative of photographs admitted into evidence and testimony at trial. The only photographs in the subfolders that were not duplicative are two photographs of Fisher's driver's license, a photograph of green vegetable matter with a scale showing 2.02 grams, and 34 photographs of evidence bags and C.V.'s clothing.

Without objection, witnesses testified at trial about the evidence bags and the clothing of C.V. and the court admitted photographs of Fisher in handcuffs with police officers standing next to him. The uncontroverted testimony at trial established the police arrested Fisher at the beach, took him into custody, and placed him in handcuffs. Officer Hubby testified that he took Fisher into custody and handcuffed him. Officer Bower, Officer Sutton, and the Hovdes also testified that Fisher was in custody and in handcuffs. Officer Hubby also testified that because the K-9 dog bit Fisher, he took a

---

[15] Fisher refers to the "Temporary Burn Folder" subfolder as the "Wet evidence photos" folder.

number of photographs of Fisher and his injuries. The court admitted photographs showing the injuries to Fisher. The court also admitted photographs showing Fisher in a hospital bed.

The parties stipulated to admission of a photograph of a red and black glass pipe, "Exhibit 33," and a photograph of a small dark canister and green leafy matter next to the canister, "Exhibit 34." One photograph in a subfolder on the 911 CD shows 2.02 grams of a green leafy matter on a scale. The unadmitted photograph shows a similar amount of green leafy matter as Exhibit 34. There was no testimony at trial about the green leafy matter. Assuming the green leafy matter is marijuana, the unadmitted photograph is not prejudicial. The photograph supports the testimony that Fisher said he and C.V. were smoking marijuana when she started screaming "rape."

The two photographs of Fisher's driver's license are not duplicative of exhibits admitted at trial. Fisher contends the photographs are prejudicial because his driver's license includes his height, weight, the color of his eyes, and his address. The physical description of Fisher was not in dispute. Fisher contends the driver's license information that his eyes are blue and he lives in Edmonds corroborates C.V.'s testimony. C.V. testified she told Officer Sutton that Fisher has "bright" blue eyes. Officer Sutton testified that when he looked at Fisher, he had "intensely blue" eyes. Detective Froland testified that he "had occasion to actually go to [Fisher's] house" and that Fisher lived in Edmonds.

Fisher also argues prejudice because the photographs are unduly cumulative and inflammatory. State v. Crenshaw, 98 Wn.2d 789, 806-07, 659 P.2d 488 (1983).

29

Fisher contends the unflattering photographs showing him in handcuffs, dirty, and injured are prejudicial. The photographs are consistent with the testimony at trial. Although repetitious, none of the unadmitted photographs are inflammatory.

Fisher also speculates that one photograph that shows him smiling at the beach was prejudicial. June 26, 2016 was a bright, sunny day and Fisher appears to be squinting in all the photographs. The State argues his expression could be attributed to the direction of the photograph. As the State notes, Fisher is not smiling or showing his teeth in the other photographs.

We conclude there are not reasonable grounds to believe that Fisher may have been prejudiced by the photographs in the subfolders on the 911 CD exhibit.

Fisher argues the jury was also improperly exposed to the extrinsic evidence of telephone calls he made from jail. At trial, the prosecutor played the drone footage video of the beach and hillside on a laptop computer. Outside the presence of the jury, defense counsel told the court he could briefly see a separate folder on the screen of the laptop labeled "Jail Phone Calls."[16]

> Your Honor, I wanted to bring to the Court's attention something that I just saw. I don't in any way think this was intentional. It appears to simply be an accident. But when the drone video was not playing, when it was stopped for maybe a quarter of a second — it was very brief — I could see what was on [the prosecutor]'s laptop, and all of the folders were labeled "Jail Phone Calls." That's at least what I saw. It appeared to me that the jury was still looking at that. So now they have seen what appears to be at least some information that has not been admitted. I understand it will not be admitted in the State's case in chief, and I do have a concern about what they saw.
> It was there very briefly. I don't think it was intentional, but something was put up on the video.

---

[16] The "Jail Phone Calls" folder is not part of Exhibit 133, the drone footage video CD.

The court ruled that even if the jury saw the folder label, there was no prejudice, but defense counsel could renew the objection.

> Well, I doubt if it was particularly noticed by the jurors. It wasn't something that drew my attention to it, and I don't see if the phone calls themselves aren't being admitted, that there is any particular prejudice.
>
> It's clear the defendant was taken into custody, which would imply that he went to jail. And if someone in jail is making phone calls, I think that would be something to be expected in the common course of someone who is being detained.
>
> So I don't think it reflects now to suggest that he is in custody or in jail, and it certainly doesn't provide any substantive information about any calls that may have been placed to or from the jail or received or placed by him.
>
> So your concern is noted. You've made the record. If you feel that there comes a time when there is something else that relates back to that brief glimpse, you can renew that objection and help explain how that may be relevant to something that you feel is objectionable.

The prosecutor told the court he would "make sure that those folders aren't in the background" when he played the drone video for the jury after the noon recess.

Defense did not renew the objection, request a curative instruction, or claim the exposure was grounds for a mistrial. There are no reasonable grounds to believe Fisher was prejudiced by the jury momentarily seeing a folder on the laptop labeled "Jail Phone Calls."

## (3) RAP 2.5(a)(3)

For the first time on appeal, Fisher argues the testimony of K-9 Officer Hubby violated <u>Miranda</u> and his constitutional right to remain silent. The State contends Fisher waived the right to challenge the testimony for the first time on appeal on the ground that he cannot establish manifest error.

Under RAP 2.5(a), we "may refuse to review any claim of error which was not raised in the trial court." But "a party may raise . . . manifest error affecting a

31

constitutional right" for the first time on appellate review. RAP 2.5(a)(3). This exception recognizes that "[c]onstitutional errors are treated specially because they often result in serious injustice to the accused." State v. Scott, 110 Wn.2d 682, 686, 757 P.2d 492 (1988). But "the exception is not intended as a method of securing a new trial whenever there is a constitutional issue that was not raised at trial." State v. Lamar, 180 Wn.2d 576, 582, 327 P.3d 46 (2014).

> [T]o qualify as a claim of manifest error affecting a constitutional right, the defendant must identify the constitutional error and show that it actually affected his or her rights at trial. The defendant must make a plausible showing that the error resulted in actual prejudice, which means that the claimed error had practical and identifiable consequences in the trial.

Lamar, 180 Wn.2d at 583.

"[T]o determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." State v. O'Hara, 167 Wn.2d 91, 100, 217 P.3d 756 (2009). "If the trial court could not have foreseen the potential error," the alleged error is not manifest. State v. Davis, 175 Wn.2d 287, 344, 290 P.3d 43 (2012), abrogated on other grounds by State v. Schierman, ___ Wn.2d ___, 415 P.3d 106 (2018); Gregory, 192 Wn.2d 1.

The Washington Supreme Court draws a distinction between the requirements of RAP 2.5(a)(3) and harmless error.

> The requirements under RAP 2.5(a)(3) should not be confused with the requirements for establishing an actual violation of a constitutional right or for establishing lack of prejudice under a harmless error analysis if a violation of a constitutional right has occurred. The purpose of the rule is different; RAP 2.5(a)(3) serves a gatekeeping function that will bar review of claimed constitutional errors to which no exception was made

unless the record shows that there is a fairly strong likelihood that serious constitutional error occurred.

Lamar, 180 Wn.2d at 583.

Before trial, Officer Bower, Officer Peck, and Edmonds Police Officer Samuel Gagner testified at a CrR 3.5 hearing. Officer Hubby did not. Officer Peck testified that after they "got off the hillside," he advised Fisher of his Miranda rights and Fisher invoked his right to remain silent. Officers searched Fisher and took photographs of him.

While Fisher was in the aid car, Officer Bower asked Fisher where he parked his vehicle and Lynnwood Police Sergeant Brault asked Fisher questions about the K-9 dog injuries.

The court ruled the statements Fisher made to police when he was on the hillside were unsolicited voluntary statements that were admissible at trial.[17] The court ruled the statements Fisher made after officers brought him down the hill and he invoked his right to remain silent were inadmissible in the State's case in chief.[18]

At trial, Officer Hubby testified that after "Fisher was brought down [the hill] by the other officers after me," he went up to Fisher and asked, " 'Dude, did you hear the announcements?' " Officer Hubby testified that he was "frustrated" because "we had

---

[17] Finding of fact 7 states, "The defendant made several unsolicited statements to the officers as they were extracting him from the underbrush and escorting him down the hillside. These statements were not in response to any questions or statements by officers." Conclusion of law 2 states, "The statements the defendant made at the time he was first contacted by police on the hillside were unsolicited and not in response to any questions or statements by the officers. . . . Those statements are admissible at trial."

[18] Conclusion of law 4 states, "The statements the defendant made to Officer Bower while in the back of the aid car were in response to questions from the officer and occurred after the defendant had previously invoked his right to remain silent. Those statements are inadmissible in the State's case-in-chief at trial." Conclusion of law 5 states, "The statements the defendant made to Sergeant Brault while in the back of the aid car were in response to questions from the officer and occurred after the defendant had previously invoked his right to remain silent. Those statements are inadmissible in the State's case-in-chief at trial."

just climbed this steep hill. You know, I was scared going up that hill, quite frankly. It — you don't know who — you know, when you don't know who you're dealing with, that can be a little bit scary at times." Officer Hubby testified, "And I remember him saying something to the effect of, 'Yeah, I did.' "

> I said, "Why didn't you come out? Like, why didn't you call out to us?"
> And Mr. Fisher responded that — at that point, and I have it quoted, but I don't want to mess it up, but something to the effect of, "Because she was yelling rape."

Fisher concedes the statement Fisher made that C.V. yelled "rape" was cumulative and admissible. Fisher claims Officer Hubby's statement that he heard the police but did not respond "showed consciousness of guilt." But the record shows Officer Bower and Officer Peck testified to similar admissible statements.

Officer Bower also testified that when they found Fisher on the hillside, Fisher said, "I knew the dog and you guys were going to find me" and, "That bitch. We were smoking weed, and she yelled rape, and I got the fuck out of there." Officer Peck testified that when he and the other officers were "roughly halfway up the hillside," he heard a male voice say, "Here I am. And Come get your dog." Officer Peck testified that Fisher said he "knew the K-9 and officers would find him, and then he also said that he had been with a female and asked if she wanted to smoke, and that she had yelled rape. So he went up the hillside."

Because the statements Fisher made to Officer Hubby occurred after he invoked his right to remain silent, Officer Hubby's testimony implicates the Fifth Amendment right to remain silent. U.S. CONST. amend. V. However, Fisher cannot show the error had practical and identifiable consequences at trial.

34

<u>(4) Cumulative Error</u>

Fisher contends the cumulative error doctrine warrants reversal. Cumulative error may warrant reversal even if each error standing alone would otherwise be considered harmless. <u>State v. Greiff</u>, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). But where, as here, the errors have little or no effect on the outcome of the trial, the doctrine does not apply. <u>Weber</u>, 159 Wn.2d at 279.

<u>Legal Financial Obligations</u>

Fisher filed a supplemental assignment of error to strike the $200 criminal filing fee.

In 2018, the Washington State Legislature amended the legal financial obligation statutes. LAWS OF 2018, ch. 269. The amended criminal filing fee statute states:

> Upon conviction or plea of guilty, upon failure to prosecute an appeal from a court of limited jurisdiction as provided by law, or upon affirmance of a conviction by a court of limited jurisdiction, an adult defendant in a criminal case shall be liable for a fee of two hundred dollars, except this fee shall not be imposed on a defendant who is indigent as defined in RCW 10.101.010(3) (a) through (c).

RCW 36.18.020(2)(h).

In <u>State v. Ramirez</u>, 191 Wn.2d 732, 747, 426 P.3d 714 (2018), the Washington Supreme Court held the 2018 amendments to the legal financial obligation statutes apply to cases "pending on direct review and thus not final when the amendments were enacted." Because the record establishes Fisher was indigent at the time of sentencing, we remand to strike the $200 criminal filing fee from the judgment and sentence.

We affirm the jury convictions of attempted rape in the second degree and attempted murder in the first degree but remand to strike the $200 criminal filing fee.

Schindler, J.

WE CONCUR:

Smith, J.

Becker, J.P.T.